# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 08-374 |
| | ) | |
| ALONZO LAMAR JOHNSON | ) | |

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge.

Defendant Alonzo Lamar Johnson ("defendant" or "Johnson") filed a Motion to Suppress Statement (ECF No. 598), alleging that the statements he made while in custody should be suppressed because they were made in violation of <u>United States v. Miranda</u>, 384 U.S. 436 (1966). Specifically, defendant argues that because he was in custody and being interrogated by an FBI agent about this case, the <u>Miranda</u> warnings were due. The court disagrees because the interrogation had not yet began at the time he made the statements. For the reasons explained below, the motion to suppress the statements is denied.

At the December 21, 2011 hearing, the court ordered the parties to file proposed findings of fact and conclusions of law within ten days of the filing of the transcript. Defendant filed his findings of fact and conclusions of law at ECF No. 734. The government filed its findings at ECF No. 751.

At issue here is whether statements made by Johnson at the time he was in custody should be suppressed because he had not been mirandized when these statements were made.[1] Johnson argues that FBI Special Agent Daniel Booker ("Agent Booker") in essence

---

[1] Essentially, the statements at issue here are: "I didn't kill anybody"; "I didn't do anything wrong"; and "I know drug dealing is against the law". ECF No. 715 at 73, 80.

1

"interrogated" him about the case without having mirandized him first. The government argues that Agent Booker did not "interrogate" him because Agent Booker was explaining to Johnson why he had been arrested and was asking routine booking questions when defendant, voluntarily, made the statements in issue. These statements, the government asserts, were not made in response to any questions posed by the agent.

To determine whether the questions posed or conduct by the agent constituted "interrogation" or its functional equivalent, courts apply the following standard:

> The Fifth Amendment prohibits the government from using incriminating statements made by the defendant unless it employs procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). This protection only applies to statements made when the defendant is both in custody and subject to interrogation. *Id.* Interrogation refers to express questioning as well as its functional equivalent, i.e., "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). If the individual indicates his wish to remain silent, he is invoking his right to exercise his Fifth Amendment privilege and the interrogation must cease. *Miranda*, 384 U.S. at 473–74. But "[a]ny statement given freely and voluntarily without any compelling influences is . . . admissible in evidence." *Id.* at 478.

United States v. Martinez, No. 11-1630, 2012 WL 375832, at *2 (3d Cir. Feb. 7, 2012).

In United States v. Young, No. 04-cr-716, 2005 WL 2789185 (E.D. Pa. Oct. 25, 2005), the district court noted:

> *Miranda* does not imply "that all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." *Rhode Island v. Innis,* 446 U.S. 291, 299, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). "Any statement given freely and voluntarily without any compelling influences is ... admissible." *Miranda,* 348 U.S. at 478. The bounds of interrogation are delineated by a "functional equivalence" test:
>
>> [T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.

2

> *Innis* 446 U.S. at 301. . . .
>
> . . .
>
> Where no interrogation takes place, Defendant's oral statements are admissible. *See McGowan v. Miller* 109 F.3d 1168, (7th Cir.1997) (denying habeas relief where state court found defendant's "incriminating statements came only after he initiated a conversation with" police, asking "What specifically are you charging me with?"); *United States v. Spurlock,* No. 96-4739, 1997 U.S. App. LEXIS 23530, at *3-4 (4th Cir. Sept. 5, 1997) (suspect who inquired as to "what law he had violated," and made incriminating statements after being informed by police of the reason for his arrest, could not suppress "statements [that] were uncoerced and not the result of any subtle interrogation"); [*United States v. Taylor,* 985 F.2d 3, 6-8 (1st Cir. 1993)] (finding no interrogation where suspect asked "Why is this happening to me?" and made incriminating remarks after police identified his alleged crime; holding otherwise "would ... propound a rule that police officers may not answer direct questions, even in the most cursory and responsive manner); [*United States v. Jackson,* 863 F.2d 1168, 1172 (4th Cir. 1989)] (defendant's incriminating statement, made after being informed of the reason for his arrest, "was admissible as a spontaneous comment voluntarily made after being fully informed of his fifth amendment rights").

Young, 2005 WL 2789185, at *2-3.

Here, the court must determine whether the statements were made in response to questions or actions by the agent or volunteered by Johnson. Agent Booker described the facts leading to Johnson's arrest and subsequent interaction with the officers. On September 9, 2009, two Allegheny County deputy sheriffs who worked in the FBI office in Pittsburgh saw Johnson walking on West North Avenue, in the Northside area of Pittsburgh, Pennsylvania. ECF No. 715 at 70, 77. The deputies were aware that there was an outstanding federal warrant for Johnson's arrest. Id. at 70. The deputies contacted police officers who were patrolling the area on bicycles and asked them to detain Johnson pursuant to the outstanding warrant. Id. The police officers made contact with Johnson at the same time the deputies arrived on the scene. Id. at 71. After being arrested, Johnson was transported to the FBI office located in the Southside area of Pittsburgh. Id. It took approximately fifteen to twenty minutes to transport Johnson from the

3

Northside to the FBI office. Id. at 71. Upon arrival, at approximately 1:00 p.m., Johnson was taken to an interrogation room. Id. at 72. In addition to Johnson, Agent Booker and three deputy sheriffs (Mullen, Countryman, and Barrett) were in the room. Id. Agent Booker introduced himself to Johnson and advised him he had been arrested "on the authority of an arrest warrant." Id. Agent Booker also told Johnson that the warrant was related to the "Braddock case". Id. At which time, Johnson stated that "he didn't kill anybody." Id. at 73, 79-80. Agent Booker replied: "I didn't say you killed anybody." Id. at 81. Then Johnson stated that and "he didn't do anything wrong," id. at 73, and "[he knew] drug dealing is against the law." Id. at 80. These statements were not made in response to questions; instead, they were made in the context of Agent Booker's preliminary explanation to Johnson about the reasons for his arrest. Id. at 73, 80-81.

Before Agent Booker could ask Johnson any questions, Johnson told him that he was aware of the arrest warrant "because he had spoken to a friend [Black Caesar, id. at 82] who had told him that Simeania Young was in a court hearing and heard that there was an arrest warrant for [Johnson]." Id. at 75. When the deputies and Agent Booker heard the name Simeania Young, they "recognized that name as one of the Defendants in this case." Id. At that point, Agent Booker advised Johnson about his Miranda rights. Id. In response to the warnings, Johnson stated that he did not want to answer to any questions without a lawyer. Id. at 75-76. Agent Booker terminated the interview at that point. Id. at 76. Johnson had been in the interrogation room for less than fifteen minutes when he asked Agent Booker to cease the interview and speak to a counsel. Id.

Johnson points to Agent Booker's statement that it was the officers' intention to talk to Johnson about the case. ECF No. 734 at 6. That argument, however, does not affect the result.

Agent Booker testified that it was his intention to talk about the case if he had some indication that Johnson wanted to cooperate. Id. at 78. Whether the officer intended to talk about the charges, while relevant, is not conclusive in determining whether the remark was reasonably likely to elicit an incriminating response. See United States v. Crisco, 725 F.2d 1228, 1232 (9th Cir. 1984).

Defendant argues that "Agent Booker made no attempt to obtain Mr. Johnson's biographical information. Rather, Agent Booker immediately began discussing the details of the case involving Mr. Johnson." ECF No. 734 at 5. Agent Booker did not so testify. Agent Booker, whose testimony was not contradicted, stated that while in the process of explaining to Johnson that he had been arrested on an outstanding warrant and that the warrant was related to the "Braddock case," Johnson made the statements at issues here. ECF No. 715 at 72-73. Agent Booker did not create circumstances likely to elicit a statement from Johnson and did not make any statements which could have compelled Johnson to respond to the agent's statement. Informing Johnson about the reasons for his arrest does not, standing alone, violate Miranda; rather, Johnson's remarks were unforeseeable. See United States v. Benton, 996 F.2d 642, 644 (3d Cir. 1993).[2] This is not a situation where Johnson "would have felt compelled to respond to the arresting officer's statement." Id.

In light of the evidence, the statements were not made in response to questions or actions by Agent Booker, which a suspect would have felt compelled to respond to; rather, the

---

[2] In Benton, the Court of Appeals for the Third Circuit concluded that the police officer did not engage in any actions designed to elicit an incriminating response from the defendant when, in response to the defendant asking the officer "what was going on", the officer told the defendant that he had seen the defendant bend down along a wooden door where a gun was found, at which time the defendant responded that no one had seen him throw away the gun. The court of appeals noted that the police officer "did nothing more than tell [defendant] why he was being arrested." Benton, 996 F.2d at 644. The court found "that this is not a situation in which a suspect would have felt compelled to respond to the arresting officer's statement." Id. The court also found that the defendant's statement was unforeseeable and gratuitous. Id.

5

statements were volunteered by Johnson.  Accordingly, the motion to suppress the statements (ECF No. 598) must be denied.  An appropriate order follows.

**ORDER**

AND NOW, the 4th day of April, 2012, for the reasons set forth above, the motion to suppress statement (ECF No. 598), filed by defendant Alonzo Lamar Johnson is DENIED.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
U.S. District Judge